USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/29/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MARKEL OVERTON, *et al.*,

                    Defendant.

S3 17-CR-644 (NSR)
ORDER & OPINION

NELSON S. ROMÁN, United States District Judge

    Defendants Raheem Jones ("Jones") and Markel Overton ("Overton") are charged, along with co-defendants Marquis Collier, David Hardy, Jermaine Hughley, and Sincere Savoy (the "Non-Moving Defendants"), in an eight-count superseding indictment filed on July 9, 2019. (S3 Indictment, ECF No. 156.) The superseding indictment charges (1) all defendants with participating in a racketeering conspiracy (Count 1); (2) the Non-Moving Defendants with conspiracy to commit murder in aid of the racketeering conspiracy, murder in the aid of racketeering, and using, carrying, and possessing firearms, resulting in death (Counts 2, 3, 4); (3) Jones and Overton with conspiracy to commit murder in aid of the racketeering conspiracy, murder in the aid of racketeering, and using, carrying, and possessing firearms, resulting in death (Count 5, 6, 7), and (4) Jones with participation in a narcotics conspiracy (Count 8). (*Id.*)

    Presently before the Court are the Jones and Overton's joint motion to sever their trial from that of the Non-Moving Defendants.[1] (ECF Nos. 186 & 187.) For the following reasons, Defendants' motion is DENIED.

---

[1]     Overton informed the Court on December 20, 2019 that he intended to join Jones's motion to sever filed on the same day. (ECF No. 187.)

**BACKGROUND**

The following facts are derived from the Superseding Indictment, Jones and Overton's joint submission in support of their motion (Def. Jones Letter Mot. to Sever ("Defs. Mot."), ECF No. 186), and the Government's brief in opposition (Gov't Mem. of Law in Opp. to Defs. Mot. to Sever ("Gov't Opp.") ECF No. 188).

**A. The Racketeering Conspiracy**

From at least 2007 to 2017, Defendants were leaders, members, and associates of the street gang known as the "Goonies" or the "Goon Squad." (S3 Indictment ¶ 1.) The Goonies operated primarily in and around the City of Mount Vernon, New York, specifically centering their operation at the Ebony Gardens Housing Projects. (*Id.*; Gov't Opp. 2.) Goonies members explicitly acknowledged, celebrated, and promoted their gang affiliation. (Gov't Opp. 2; S3 Indictment ¶ 7(c).) Indeed, members often had Goonies-related tattoos and proclaimed their gang affiliation on various social media sites.[2] (Gov't Opp. 2; S3 Indictment ¶ 7(c)-(d).) Although the Goonies did not maintain a formal or rigid hierarchy, Overton was considered one of the gang's leaders. (S3 Indictment ¶ 5.)

The Goonies were highly territorial and considered their territory to be the area surrounding Ebony Gardens. (Gov't Opp. 2.) To protect and expand their operations, which included selling illegal drugs within and around Ebony Gardens, members of the Goonies engaged in various acts of criminal conduct and violence against rival gang members and other adversaries. (*Id.* at 2-3; *see also* S3 Indictment ¶ 7(a).) In particular, the Goonies used violence to prevent what was

---

[2] Specifically, members would post photographs and videos of themselves wearing articles of clothing emblazoned with references to the gang and would tag photos with comments that incorporated gang-related words and phrases, such as "GS," "Squad," "Loopygoons," and "Loopy Gang." (Gov't Opp. 2.)

2

perceived as encroachment into the gang's dominance over rival gangs and those who struck against the Goonies. (Gov't Opp. 3.)

### B. Murder of Dean Daniels

On September 22, 2014, in the vicinity of Park Avenue, Mount Vernon, New York, Ernest Webb and another individual ("Individual-1") shot and killed Dean Daniels, a rival drug dealer who had carjacked Webb at gunpoint two days earlier. (Defs. Mot. 2; Gov't Opp. 3; S3 Indictment ¶ 21.) According to the Government, Jones and Overton aided and abetted this murder by pressing Webb to retaliate against Daniels for the carjacking. (Gov't Opp. 3; *see also* S3 Indictment ¶ 21.) Once Webb and Individual-1 shot Daniels, they ran down the street and entered a vehicle operated by Overton and Jones. (Defs. Mot. 2; Gov't Opp. 3.) Overton and Jones then drove Webb and Individual-1 away from the crime scene. (Defs Mo.t 2; Gov't Opp. 3.)

### C. Murder of Shamoya McKenzie

On December 31, 2016, at around 2:30 P.M. in Mount Vernon, 13-year-old Shamoya McKenzie ("Shamoya") and her mother were traveling home from basketball practice. (Defs. Mot. 1.) As they were driving, the Non-Moving Defendants shot Shamoya in the head and killed her. (*Id.*; Gov't Opp. 3.) The Non-Moving Defendants had been attempting to retaliate against a leader of a rival gang but instead mistakenly killed Shamoya. (Defs. Mot. 1; Gov't Opp. 3.)

## DISCUSSION

Jones and Overton's primary argument for severance is that evidence related to the Non-Moving Defendants' murder of Shamoya McKenzie (the "McKenzie Murder") will be highly prejudicial, particularly because of (1) the fact that neither defendant participated in the murder, (2) the emotional weight surrounding the murder, and (3) the anticipated media scrutiny. (Defs.

Mot. 3.) They further contend that the two murders charged in the superseding indictment were "not part of a unified plan" and instead constitute "two distinct offenses." (*Id.*)

As the Supreme Court has explained, the "preference in the federal system [is] for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). Joint trials seek to promote "economy and efficiency and to avoid a multiplicity of trials, [so long as] these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial." *Bruton v. United States*, 391 U.S. 123, 121 n.6 (1968) (internal quotations omitted).

Under Rule 14(a) of the Federal Rules of Criminal Procedure, however, courts may "order separate trials of counts, sever the defendants' trials or provide any other relief that justice requires" in cases where "the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government." To demonstrate that severance is proper, a defendant must establish substantial prejudice. *See United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991) ("The defendant prejudice so great as to deny [him or her] a fair trial."). "Substantial prejudice does not simply mean a better chance of acquittal." *United States v. Potamitis*, 739 F.2d 784, 790 (2d Cir. 1984), *cert. denied*, 469 U.S. 934 (1984). Rather, the prejudice of a joint trial must constitute a "miscarriage of justice." *United States v. Miller*, 116 F.3d 641, 679 (2d Cir. 1997) (quoting *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993)). And even when the risk of prejudice is great, limiting instructions will often "suffice as an alternative to granting a Rule 14 severance motion." *United States v. Feyrer*, 33 F.3d 110, 114 (2d Cir. 2003). Thus, severance is generally warranted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 509 U.S. at 539.

As the Second Circuit has held, severance may be warranted where there is a risk of "prejudicial spill over." *United States v. Salameh*, 152 F.3d 88, 115-16 (2d Cir. 1998). In other words, "'[p]rejudice' occurs in joint trials when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is improper." *Id.*; *see also Zafiro*, 509 U.S at 539 ("Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant [] might present a risk of prejudice."). Nevertheless, "[w]here a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible." *Salameh*, 152 F.3d at 111. This is particularly true when the government charges a RICO conspiracy, as "proof of crimes committed by other individuals in a RICO conspiracy," including evidence of murders, "is relevant to show the existence and nature of the enterprise." *United States v. Brady*, 26 F.3d 282, 287 (2d Cir. 1994) (concluding that, because the evidence was relevant to establish the existence of RICO enterprise, the court did not err in allowing evidence of actual murders to be elicited during trial of co-defendants who had not committed any of the murders).

Here, the Court concludes that there is no basis for severance. As an initial matter, Jones and Overton have been charged under the same conspiracy as the Non-Moving Defendants, *i.e.* all defendants are alleged to be members or associates of the Goonies. For this reason, even if Jones and Overton were tried separately from the Non-Moving Defendants for their respective roles in the conspiracy, the Government would not be precluded from offering evidence of the McKenzie Murder because evidence of that criminal conduct would be used to establish the existence and nature of the alleged criminal enterprise. *See United States v. Conyers*, No. S13 15-CR-537 (VEC), 2016 WL 7189850, at *6-7 (S.D.N.Y. Dec. 9, 2016) (rejecting motion to sever premised on danger of prejudicial spillover because evidence of crimes to which defendant was not privy committed

by co-conspirators in a single racketeering conspiracy would still be "admissible even at a trial where [defendant] would be the sole defendant"). The same would be true regardless of any differences in culpability and proof between the various co-defendants or the purported differences—in nature and emotional impact—between the two charged murders. *See United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003) ("'[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials.'" (quoting *United States v. Carson*, 702 F.2d 351, 366-67 (2d Cir. 1983))); *United States v. Feola*, 651 F. Supp. 1068, 1123-24 (S.D.N.Y. 1987) ("[I]t is well established that 'simply because the evidence against codefendants is stronger or that one defendant's role in the crime is lesser than that of others is not sufficient reason to grant a severance'").

That Jones happened to be incarcerated at the time of the McKenzie Murder does not alter this conclusion. It is well settled that "a conspirator who has been arrested remains responsible for acts committed in furtherance of the conspiracy by co-conspirators who are still at large." *United States v. Massino*, 546 F.3d 123, 136 (2d Cir. 2008) (quoting *United States v. Cruz*, 797 F.2d 90, 98 (2d Cir. 1986)). One exception exists when a defendant proves "some act that affirmatively establishes that he [or she] disavowed [] criminal association with the conspiracy and that he [or she] communicated [] withdrawal to the co-conspirators." *United States v. Diaz*, 176 F.3d 52, 98 (2d Cir. 1999); *see also United States v. Williams*, No. 02-CR-1372 (RPP), 2014 WL 3537046, at *3 n.1 (S.D.N.Y. July 17, 2014) ("It is well established that where the government has shown that a conspiracy existed and that a given defendant was a member of it, his membership is presumed to continue until the last overt act by any of the coconspirators, unless the defendant proves that the conspiracy was terminated or that he took affirmative steps to withdraw."). To this end, an "'arrest or incarceration *may* constitute a withdrawal from a conspiracy.'" *United States*

*v. Flaharty*, 295 F.3d 182, 192-93 (2d Cir. 2002), *cert. denied*, 537 U.S. 936 (2002) (quoting *United States v. Agueci*, 310 F.2d 817, 839 (2d Cir. 1962)). Critically, however, "'it does not follow that in every instance [arrest or incarceration] *must* [constitute withdrawal].'; rather, it is merely a relevant fact that entitles the defendant to a jury instruction on withdrawal." *United States v. Martinez*, 862 F.3d 223, 233 (2d Cir. 2017), *vacated on other grounds*, 139 S. Ct. 2772 (2019) (quoting *Flaharty*, 295 F.3d at 192). Here, Jones does not argue that he disavowed his association with the Goonies upon his incarceration. Rather, he only contends that he could not "play[] any part in the murder conspiracy that resulted in" Shamoya's death because he had been in federal custody for over a year at the time of the incident. (Defs. Mot. 3.) Although Jones is free to mount a defense at trial establishing his withdrawal prior to the McKenzie Murder, for purposes of this motion, his incarceration is not sufficient grounds for severance. *See United States v. Romero*, 788 F. Supp. 798, 800 (S.D.N.Y. 1992) ("Mr. Carter's second claim that he was not a member of the conspiracy because he was incarcerated for a lengthy period of the alleged conspiracy, is also insufficient grounds for severance. Defendant's incarceration during a substantial portion of the period charged in the conspiracy count does not necessarily [a]ffect a withdrawal or termination of that defendant's participation in a conspiracy."); *see also Jones v. United States*, No. 3:14-cv-01513 (VLB), 2018 WL 325234, at *5 (D. Conn. Jan. 7, 2018) ("Severance is not automatic in circumstances where a defendant is incarcerated during the conspiracy, particularly where there is substantial evidence of the defendant's involvement in the conspiracy prior to incarceration and withdrawal relates 'only to the improper use against him of subsequent acts and declarations of coconspirators.'").

Equally unavailing are Jones and Overton's contentions that they will be prejudiced by the heavy media scrutiny of the McKenzie Murder and the fact that "Miss McKenzie's family will be

a force within the courtroom." (Defs. Mot. 3.) As it relates to media scrutiny, this Court is in no position to speculate about the nature of the media coverage of the upcoming trial or how it would implicate Defendants. *Cf. United States v. Biaggi*, 672 F. Supp. 112, 123-24 (S.D.N.Y. 1987) (declining to sever trial where defendant had argued that he would be prejudiced by a joint trial with a Congressman whose "national stature may result in more intense media coverage" but did not otherwise establish—beyond speculation—that coverage would be unfavorable to him specifically). Nor does it have any reason to doubt that jurors would be impartial, especially given the availability of *voir dire* and admonitions by the Court to avoid exposure to any news media about the trial. *See United States v. Casamento*, 887 F.2d 1141, 1154-55 (2d Cir. 1989) ("Here, in light of the district judge's instructions and inquiries of the jury via voir dire, and his considered conclusions as to the jurors' impartiality, we believe that he acted well within his discretion in deciding that the publicity which the trial generated did not affect the jurors' ability to serve fairly."); *United States v. Gotti*, 399 F. Supp. 2d 214, 217-18 (S.D.N.Y. 2005) (explaining that "notoriety" of a co-defendant was "irrelevant to the question of severance" in light of the availability of a "searching voir dire and emphatic jury instructions"). Regarding the fact that "Miss McKenzie's family will be a force" in the courtroom, neither Jones nor Overton offer any argument as to how the family's presence—as opposed to any other victim's family's presence—in an open courtroom will amount to anything close to substantial prejudice.

In any event, even if evidence of the McKenzie Murder would amount to prejudicial spillover, Jones and Overton fail to establish that a limiting instruction would not suffice to cure any risk of unfair prejudice. Jones and Overton speculate that "[n]o limiting instruction can cure the effect" of the evidence of the McKenzie Murder and that "the average juror" will not be able to "parse out the evidence as it relates to the individual defendants." (Defs. Mot. 3.) Jones and

Overton have plainly disregarded the "fundamental proposition that a jury is presumed to follow the instructions of the trial judge" and "to act logically" in doing so. *United States v. Pforzheimer*, 826 F.2d 200, 205 (2d Cir. 1987); *see also Potamitis*, 739 F.2d at 790 (explaining that it is "sound doctrine . . . that juries must be supposed usually to be able and determined to follow instructions"). Regardless, the Court is confident it can provide jurors with clear, concise, and specific instructions that will ensure that the jury evaluates the evidence separately against each defendant individually. *See United States v. Lasanta*, 978 F.2d 1300, 1307 (2d Cir. 1992), *abrogated on other grounds*, *Florida v. White*, 526 U.S. 559 (1999) ("The district court countered any possible spillover with specific instructions to the jury, repeating no less than eight times that the jury should consider the evidence separately against each defendant.").

In conclusion, Jones and Overton have failed to overcome the strong presumption against severance of the Superseding Indictment. As such, Defendants' severance motion is DENIED.

## CONCLUSION

For the foregoing reasons, Defendants' joint motion is DENIED. The next status conference on this matter remains scheduled for January 31, 2020 at 12:00 P.M. All defendants are directed to appear at that time.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 186 & 187.

Dated: January 29, 2020
White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge